**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **AIXA VERGARA**, on her own and on behalf of her minor son **CMRV**, **EDGARDO NERIS TORRES**, <br><br> Plaintiffs, <br><br> v. <br><br> **WESLEYAN ACADEMY, INC., et al.,** <br><br> Defendants. | CIVIL NO. 17-1013 (PG) |

## <u>OPINION AND ORDER</u>

Before the court is Defendants' Motion for Summary Judgment (ECF No. 32), Plaintiffs' Response in Opposition (ECF No. 50), and Defendants' Reply (ECF No. 58). For the reasons set forth below, the court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion.

## I.    BACKGROUND

On January 4, 2017, Plaintiffs Aixa Vergara ("Vergara"), on her own and on behalf of her son "CMRV," and the minor's step-father Edgardo Neris Torres (collectively, "Plaintiffs") filed this suit against Wesleyan Academy, Inc. ("Wesleyan" or "the School"), Wesleyan's Headmaster, President and Executive Director, Fernando J. Vazquez Zayas ("Vazquez"), and Wesleyan's High School Principal, Ingrid Llorens de Pagan ("Ms. Llorens") (collectively, "Defendants"). <u>See</u> Compl., ECF No. 1. Plaintiffs allege that Wesleyan and its employees discriminated against CMRV because of his physical and mental disabilities by expelling him and refusing to provide him reasonable accommodations. Plaintiffs also allege retaliation for engaging in protected conduct. They claim Defendants' actions are in violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504"), as well as Puerto Rico statutes

prohibiting disability discrimination and retaliation and cyberbullying. Plaintiffs request compensatory and punitive damages under federal and Puerto Rico laws.

Plaintiffs' complaint included a request for a Temporary Restraining Order ("TRO"), which the court granted in part. <u>See</u> Op. and Order from January 7, 2017, ECF No. 3. The court ordered Defendants to readmit CMRV as a student and allow him to continue his eleventh-grade studies at Wesleyan. Since Plaintiffs also sought a preliminary injunction, the court set a hearing for January 13, 2017. However, on that date, the parties agreed to convert the TRO into a preliminary injunction or *pendente lite.* ECF No. 14.[1] Later that month, the court held a status conference during which case management deadlines *de rigueur* were set. ECF Nos. 18, 29. Defendants now move for summary judgment and Plaintiffs oppose their request.

## II.    STANDARD OF REVIEW

A motion for summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure, which entitles a party to judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When the party who bears the burden of proof at trial is faced with a properly constituted summary judgment motion, defeating the motion depends on her ability to show that such a dispute exists." <u>Geshke v. Crocs, Inc.</u>, 740 F.3d 74, 77 (1st Cir. 2014) (citing <u>Borges ex rel. S.M.B.W. v. Serrano-Isern</u>, 605 F.3d 1, 5 (1st Cir. 2010)).

At the summary judgment juncture, the court must examine the facts in the light most favorable to the non-movant, indulging that party with all possible inferences to be derived

---

[1] Although the parties later filed the agreement in its entirety, and the court allowed them to restrict its viewing to selected parties, the terms and conditions of the agreement were placed on the record during proceedings held in January of 2017. <u>See</u> ECF No. 15.

from the facts. <u>See</u> <u>Rochester Ford Sales, Inc. v. Ford Motor Co.</u>, 287 F.3d 32, 38 (1st Cir. 2002). The court need not "draw <u>unreasonable</u> inferences or credit bald assertions, empty conclusions, rank conjecture or vitriolic invective." <u>Cherkaoui v. City of Quincy</u>, 877 F.3d 14, 23 (1st Cir. 2017) (quoting <u>Pina v. Children's Place</u>, 740 F.3d 785, 795 (1st Cir. 2014)). The court reviews the record "as a whole," and "may not make credibility determinations or weigh the evidence." <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 135 (2000). This is so because credibility determinations, the weighing of the evidence and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. <u>Id.</u>

If the non-movant generates uncertainty as to the true state of any material fact, the movant's efforts should be deemed unavailing. <u>Suarez v. Pueblo Int'l</u>, 229 F.3d 49, 53 (1st Cir. 2000). But the mere existence of "some alleged factual dispute between the parties will not affect an otherwise properly supported motion for summary judgment." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48, 106 S. Ct. 2505 (1986). <u>See</u> <u>Cherkaoui</u>, 877 F.3d at 23-24 (quoting <u>Sanchez v. Alvarado</u>, 101 F.3d 223, 227 (1st Cir. 1996)) (noting that "[f]acts are material when they have the 'potential to affect the outcome of the suit under the applicable law'" and that "[a] dispute is 'genuine' if 'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party'").

## III.    FINDINGS OF FACT

Aixa Vergara is CMRV's mother. CMRV is a disabled student with physical and mental disabilities. He began his studies at Wesleyan in Kindergarten. ECF No. 1 ¶ 16; Pls.' Statement of Material Facts Which Preclude Entry of Summ. J. in Defs.' favor pursuant to Local Rule 56(c), (e) ("PSMF") ¶ 1, ECF No. 50-2. CMRV suffers from the following mental and physical impairments: Attention Deficit Disorder ("ADD") with predominately-inattentive hyperactivity; severe major depression; fine motor skills problems; visual

perception difficulties and renal insufficiency. Ecf No. 1 ¶ 11. These impairments, according to plaintiffs, substantially limit various life activities, like his ability to study, to learn and to excrete urine. Id. at ¶ 14.

Wesleyan Academy is a private, non-profit, evangelical Christian school affiliated with the Wesleyan Church that receives federal funds or financial assistance from the United States Department of Education. See Defs.' Statement of Uncontested Material Facts ("SUMF") ¶ 1, ECF No. 32-1; ECF No. 1 ¶ 18; Answer to Compl. ¶¶ 17-18, ECF No. 22. The Wesleyan School Community Handbook states that the School "strives to present a Christian world view and democratic values in an environment of academic excellence." SUMF ¶ 1.[2]

At the time of the events alleged in the complaint, Co-Defendant Vazquez was Wesleyan's President and Executive Director; Co-Defendant Ms. Llorens, Wesleyan's High School Principal; Betsey Cora ("Ms. Cora"), the High School Guidance Counselor; Leyda Mercado, another Student Counselor; and Betzaida Flores, Wesleyan's Social Worker. See, e.g., SUMF ¶¶ 47 & 64; PSMF ¶ 10.

The Wesleyan Academy Policy Manual states that the school's opportunities are offered regardless of social or political factors, and prohibits discrimination "in any of its policies, practices, or procedures on the basis of race, class, color, national origin, sex, or handicap as defined by law." SUMF ¶ 2.[3] The Manual also provides that "Wesleyan admits and welcomes students of any race or class, color, national and ethnic origin, sex or

---

[2] The parties submitted the Wesleyan Academy Community Handbook, the entire Wesleyan Policy Manual mentioned below and its amendments as part of their restricted agreement pendente lite. See Ex. 1-3, ECF No. 13-1 to 13-3.

[3] Plaintiffs offer the same qualification for SUMF ¶¶ 1-4: "the fact that Defendants are quoting from Wesleyan's Policy Manual and School Community Handbook does not mean that [they] actually complied with the postulates contained in such documents." Pls.' Resp. to Defs.' "SUMF" pursuant to Local Rule 56(c), (e) at 13, ECF No. 50-1. Plaintiffs further aver that Defendants' conduct runs afoul with the contents of the cited materials. The court notes their qualification and will proceed to present the undisputed facts in the light most favorable to Plaintiffs.

handicap, and does not discriminate on this basis in admissions or in any area of the school life and program." SUMF ¶ 3 (quoting Ex. 2, ECF No. 32-3 at 5).

Under the Manual, the basic qualifications for admission are: "(1) desire to attend [the school]; (2) demonstrate[] average or above average academic ability; (3) a pattern of obedient behavior, and (4) evidence of being able to live in harmony with our purposes and way of life." SUMF ¶ 3. The Manual warns that by enrolling in the school, students and their parents accept and agree to comply with Wesleyan's policies, rules and regulations. Id. ¶ 4. Wesleyan has a Procedure Manual for the Implementation of the Reasonable Accommodation Passport for Post-Secondary Education. It is not incorporated in the Handbook or the Policy Manual. PSMF ¶ 39.

### Elementary School

In January of 2005, Vergara applied to enroll her minor son in kindergarten at Wesleyan, for the 2005-2006 school year. SUMF ¶ 5. Throughout elementary school, CMRV struggled to meet Wesleyan's academic and conduct standards. Wesleyan continually conditioned CMRV's admission and enrollment on his academic improvement and other requirements. Id. ¶¶ 6-7, 11, 17-18, 19.[4] CMRV had to be tutored, attend summer school for

---

[4] SUMF ¶ 11 relates to Wesleyan's decision to withhold CMRV's acceptance to the fourth grade pending Vergara's compliance with the school's request for a professional evaluation of the student and recommendations for improvement. Plaintiffs' qualification of the proposed fact states in relevant part: "As to the letter dated January 20, 2009, Vergara signed it because if she did not sign, Wesleyan would not enroll her son." ECF No. 50-1 at 13-14.

Plaintiffs' qualification of SUMF ¶ 11 does not clarify, modify or limit Defendants' factual assertion, as required under current summary judgment standards. See Rodriguez-Soto v. Presbyterian Med. Anesthesia Grp., Civil No. 17-1477 (GAG), 2019 WL 1349991, at *2 (D.P.R. Mar. 22, 2019) (explaining that a qualification "must clarify a statement of fact that, without clarification, could lead the Court to an incorrect inference"); Richardson v. Mabus, 203 F. Supp. 3d 86, 113-114 & n. 48 (D. Me. 2016) (admitting defendant's statement of uncontested material fact as submitted in light of plaintiff's inapposite qualification of that fact). The court thus accepted SUMF ¶ 11 as uncontested, and disregarded other qualifications offered by Plaintiffs that fail to comply with the summary judgment rules.

Plaintiffs admit and deny SUMF ¶ 19, arguing that Defendants did not include proper record citations. Their contention is unavailing because Defendants did include the required citations in support of that fact. Plaintiffs' remaining assertions in response to SUMF ¶ 19 are either unintelligible or irrelevant, and therefore,

Spanish and math subjects, undergo evaluations or receive occupational therapy. Vergara did not always comply with some of the requests and conditions established by the school. Id. ¶¶ 8, 10-12, 17-22.

Psychological Evaluations

In 2009, clinical psychologist Dr. Amalyn Perez Rivera ("Dr. Perez"), began evaluating CMRV. In her first psychological evaluation report, Dr. Perez concluded that CMRV did not show any difficulties associated with attention deficit, following instructions or other problems of distraction. Nonetheless, Dr. Perez's report advised that CMRV needed to strengthen his interpersonal relationship skills and social interactions. Id. ¶¶ 13-15.[5]

On March 9, 2009, Dr. Perez provided a second psychological evaluation report. This time, Dr. Perez found that CMRV showed a "[s]light lag in fluidity skills in writing and redaction" and a "[s]ignificant lag in fluidity skills in mathematics." Id. ¶ 16.

Middle School

When CMRV was in eighth grade, Vergara enrolled him in an after-school music program at the Puerto Rico Conservatory of Music (the "Conservatory"). He continued to participate in the music program throughout his middle school and high school years. Id. ¶ 23. CMRV finished his eighth grade with the following grades: English, 71%; Math, 65%; Science, 87%; Physical Education, 98%; Spanish, 72%; Social Studies, 58%; Bible, 55%; Music, 90%; Art, 86%; Communication, 71%. Id. ¶ 24; PSMF ¶ 11. CMRV thus had to attend Wesleyan's summer program, where he obtained 32% in Social Studies and 88% in Bible. SUMF ¶ 25.

---

the court disregarded them.

[5] The first report is dated February 14, 2009. See Cert. English Translation of Defs.' Ex. 7, ECF No. 42-1. As mentioned below, Dr. Perez rendered a second report on March 9, 2009. See Cert. English Translation of Defs.' Ex. 8, ECF No. 42-2.

## High School

As noted before, CMRV continued to participate in the Conservatory's after-school music program throughout ninth grade. Id. ¶ 26. Vergara considered not enrolling him for the first semester of ninth grade so that he could focus on school. Id. ¶ 29. Later during that semester, CMRV e-mailed his Physical Science teacher, Aidyn Fontanez ("Fontanez"), with concerns about his performance and grade in the class. CMRV admitted that he missed a test due to a medical appointment and that he knew he had not been "very responsible." He also requested extra credit to raise his grade. Id. ¶ 27; PSMF ¶ 12. Fontanez responded with feedback and informed that she had referred his e-mail to Wesleyan's guidance counselor and high school principal. SUMF ¶ 28.

### First "No-Return" Decision

On January 13, 2015, Wesleyan informed CMRV that he had not been accepted to tenth grade. Id. ¶¶ 30-32; PSMF ¶¶ 13-15. As the No-Return Letter explained, the decision was based on CMRV's poor academic performance, grades (one D and two F's in Bible, Algebra and Physical Science), excessive tardiness, and other factors (e.g., unpreparedness, poor attitude, and failure to make up for his work or hand his work on time). SUMF ¶¶ 30-31.[6] Upon Vergara's request, Wesleyan reconsidered the no-return decision and readmitted

---

[6] Plaintiffs deny Defendants' SUMF ¶ 30 arguing that the no-return Letter cited in support constitutes inadmissible hearsay and lacks proper authentication. See Defs.' Ex. 18, ECF No. 33-8; ECF No. 50-1 at 5-6. However, under current Rule 56(c)(2), Plaintiffs' objection must be that the evidence at issue cannot be submitted in a trial-admissible form. Fed. R. Civ. P. 56(c)(2). See Mercado-Reyes v. City of Angels, Inc., 320 F. Supp. 3d 344, 350 (D.P.R. 2018) (quoting S.E.C. v. Ramirez, 2018 WL 2021464, at *7 (D.P.R. Apr. 30, 2018) (Delgado–Hernández, J.)) (rejecting the defendant's hearsay objection to the plaintiff-nonmovant's affidavit because "a district court may consider hearsay evidence submitted in an inadmissible form at the summary judgment stage where the content of the evidence proffered could later be provided in an admissible form at trial."); Gonzalez-Bermudez v. Abbott Labs. PR Inc., 214 F. Supp. 3d 130, 137 (D.P.R. 2016) ("The objecting party must thus state the proper grounds for which the opposing party's evidence *cannot be presented in a form that would be admissible at trial.*"). Plaintiffs do not provide any substantive reason why the content of the letter could not be presented in an admissible form at trial.

Also, Plaintiffs quote former Rule 56(e) requiring authentication for all documents supporting or opposing motions for summary judgment. After the 2010 amendments to the rule, authentication is no longer

CMRV, subject to an updated psychological evaluation. Id. ¶¶ 32-33. Plaintiffs maintain that this event caused them considerable emotional damages for which they sought pastoral counseling at their church and psychological counseling for CMRV. PSMF ¶ 16.

On February 14, 2015, Dr. Perez diagnosed CMRV with ADD. SUMF ¶¶ 34-35. On February 15, 2015, CMRV e-mailed his English teacher admitting he forgot to hand in an assignment and asking if he could turn it in late to "get at least half credit[.]" Id. ¶ 36. A week later, CMRV wrote an e-mail to Fontanez to make the same request. Id. ¶ 37. Fontanez granted the extension, allowing him to turn in the assignment late for partial credit. Id. ¶ 38. The next day CMRV e-mailed his History teacher to find out his grade in the class and ask if he could raise it to B with an upcoming assignment. Id. ¶ 39. On March 12, CMRV e-mailed his English teacher saying that he would be turning in an essay the following day and that he understood "[he wouldn't] get full credit." Id. ¶ 40.

CMRV was admitted to the tenth grade on the following conditions: (1) obtain at least 70% in all classes; (2) maintain good conduct; (3) schedule medical appointments after school hours; (4) attend summer school for Physical Science, Health and Algebra I; (5) quarterly evaluations of CMRV's progress by the Admissions Committee. Id. ¶ 42; Ex. 26, ECF No. 34-6. Wesleyan also urged Vergara to become more involved in CMRV's education and recommended she communicate frequently with teachers and the school. SUMF ¶ 43. On May 20, Vergara received CMRV's acceptance letter and enrolled him for the tenth grade.

---

required. Garcia-Garcia v. Costco Wholesale Corporation, 878 F.3d 411, 418 n. 11 (1st Cir. 2018) (citing Fed. R. Civ. P. 56; 10B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2738 (4th ed. 2017 Update)) (so noting); Gonzalez-Bermudez, 214 F. Supp. 3d at 137 (citing Int'l Shipping Agency, Inc. v. Union de Trabajadores de Muelles Local 1740, Civil No. 12-1996 (SCC), 2015 WL 5022794, at *3 (D.P.R. Aug. 21, 2015)) (denying parties' objections to summary judgment exhibits lacking authentication). Finally, Plaintiffs rely on several of Defendants' supposedly inadmissible and unauthenticated exhibits to support their opposing and additional statements of fact. See, e.g., PSMF ¶ 13 (where, importantly, Plaintiffs state that CMRV received the No-Return Letter from January 13 notifying the expulsion, and thereafter, Vergara asked Wesleyan to reconsider). The court reminds them that those who live in glass houses should not throw stones. At bottom, the facts related to this no-return decision remain undisputed.

Id. ¶ 44. CMRV took the required summer courses and earned the following grades: Physical Science, 91%; Health, 90%; Algebra I, 61%. Id. ¶ 46.

On September 25, 2015, Vergara met with Ms. Llorens and Ms. Cora to establish a reasonable accommodation plan for CMRV. Id. ¶ 47. The parties agreed that CMRV had to obtain a minimum of 70% in all his classes, including electives. Id. ¶ 50. Wesleyan agreed to reserve a desk for CMRV in front of the classroom; his teachers would provide clear instructions, positive reinforcement, additional time for class work and exams, and whenever possible, administer exams one page at a time. Id. ¶ 48. Under this plan, CMRV's parents had to implement the recommendations given by the professionals treating or evaluating CMRV, and submit evidence thereof; meet with teachers on a monthly basis and schedule additional meetings with them; submit CMRV to a neurological evaluation; provide a "quiet, structured home environment, conductive to studying[,]" as well as an "educational, social, family environment to help CMRV's development." Id. ¶¶ 49-50.

Sitting in the front of the classroom allowed CMRV to focus. Id. ¶ 56. His teachers gave him extra time to complete quizzes and exams when he so requested, but that was not always the case.[7] Id. ¶¶ 57-58. CMRV continued to attend after-school music lessons at the Conservatory during that year. Id. ¶ 59.

<u>Second "No-Return" Decision</u>

On January 24, 2016, Wesleyan informed that CMRV would not be admitted to eleventh grade for the 2016-2017 school year because he failed to obtain at least 70% in all his classes during the first semester of tenth grade. The letter specifically mentioned CMRV

---

[7] Notwithstanding Plaintiffs' qualifications or denials of Defendants' proposed facts, CMRV's deposition testimony shows that he mostly needed accommodation for math class. Regarding other subjects (e.g., History, English and Spanish), CMRV explained that he only sometimes needed extra time to take notes or "write things down." See Ex. 13, ECF No. 33-3 at 20-21. Based on the evidence, SUMF ¶¶ 51 to 53 and 55 are undisputed.

finished that semester with 67% in English and 64% in Biology I. Id. ¶ 60. Upon Vergara's reconsideration request, Wesleyan decided to readmit CMRV for the first semester of eleventh grade on several conditions: (1) obtain at least 75% in all classes, per quarter; (2) mandatory tutoring for any class in which his grade dipped below 75%; (3) turn in projects and assignments on or before their due date; (4) quarterly meetings between CMRV's parents and teachers. Id. ¶¶ 61-62. After receiving the conditional acceptance letter, Vergara decided to enroll CMRV for the first semester of the 2016-2017 year. Id. ¶ 63.[8]

On February 25, 2016, CMRV met with the guidance counselor, Ms. Cora, to discuss his academic performance and his first semester final grades. During the meeting, CMRV admitted he had failed to meet deadlines. Ms. Cora thus emphasized the importance of working on projects as soon as they are assigned to submit them in a timely manner. CMRV agreed he would do his homework everyday; review each class daily; write down assignments in his agenda; and study for quizzes and tests on weekends. Finally, CMRV recognized that he needed to raise his grades. Id. ¶ 65; Ex. 31, ECF No. 35-1.

The next day, CMRV met with Omar Gonzalez ("Mr. Gonzalez"), his tenth grade Geometry teacher, to discuss his performance and strategies for improvement. SUMF ¶¶ 67-68; Ex. 32, ECF No. 35-2. Following Mr. Gonzalez's recommendation, Vergara enrolled CMRV in a pilot program that provided online tutoring for students with difficulty in math. SUMF ¶ 69. CMRV used the program until the end of his Geometry class in May 2016. Id. ¶ 70.

For the second semester of tenth grade, CMRV attended the Conservatory's after-school music program, where he took classes on Tuesdays, 5:00 PM to 6:00 PM; 7:00 PM to

---

[8] In Wesleyan, the passing grade for every subject is 70%. High school students who fail must take summer school for the required course before advancing to the next grade level. PSMF ¶ 34.

8:30 PM; Wednesdays, 4:30 PM to 5:00 PM; Thursdays, 4:30 PM to 6:00 PM; and Saturdays, 12:00 PM to 3:00 PM. Id. ¶ 71. CMRV finished tenth grade with the following grades: English, 61%; Geometry, 69%; Biology I, 61%; Physical Education, 90%; Spanish, 68%; History, 78%; Bible, 95%; Music, 100%. Id. ¶72. Because CMRV did not obtain passing grades in four of his classes, he had to attend summer school. His final grades for those classes were: English, 78%; Geometry, 69%; Biology I, 61%; Spanish, 75%. Id. ¶ 73; Ex. 34, ECF No. 35-4.

On August 12, 2016, Plaintiffs met with Ms. Llorens and Ms. Cora to go over the conditions previously established for CMRV's acceptance to the first semester of eleventh grade. Id. ¶ 74. They did not establish a reasonable accommodation plan for that academic year. PSMF ¶ 38. Early in September of 2016, CMRV's Algebra II teacher, Paola Enriquez ("Ms. Enriquez"), e-mailed Vergara with concerns about CMRV's performance in her class and the fact that he had a 73% grade. SUMF ¶¶ 75-76. Soon thereafter, Vergara and her son met with Ms. Llorens, Ms. Cora, Ms. Enriquez and Mr. Gonzalez. Id. ¶ 77. During that meeting, Ms. Enriquez mentioned that CMRV was not turning all his work on time.[9] As previously noted, complying with deadlines for projects and assignments was one of several conditions for CMRV's acceptance. Id. ¶ 86.

Vergara requested that CMRV be placed in Mr. Gonzalez's Algebra II class because his teaching style was better for CMRV than Ms. Enriquez's. Id. ¶¶ 78-80.[10] Defendants denied the request, but the parties agreed that CMRV could seek Mr. Gonzalez for help, questions or doubts about Algebra II during lunch or office hours. Id. ¶¶ 82-83. CMRV never

---

[9] The court modified Defendants' SUMF ¶ 86 to incorporate Plaintiffs' qualification, which in turn, reflects Vergara's deposition testimony that CMRV turned in "some" of his math work late. ECF No. 50-1 at 15.

[10] Plaintiffs admit that Ms. Enriquez had tried to explain the material to CMRV independently to no avail— "he just did not understand it." SUMF ¶ 81.

sought his help. Id. ¶ 84. After that meeting, Ms. Enriquez began tutoring CMRV approximately three times a week. CMRV took between six to nine tutoring sessions, but his grades did not improve. Some time later, Ms. Enriquez informed Vergara that she would no longer be able to tutor CMRV. Id. ¶¶ 87-89.

On September 29, 2016, Ms. Cora e-mailed Vergara about CMRV's concerns regarding his grade (53%) and performance in Algebra II. She mentioned the fact that CMRV had not sought Mr. Gonzalez's help with the subject and reminded Vergara the importance of him doing so. She also provided tutoring alternatives for CMRV, subject to Vergara's approval and confirmation. Id. ¶ 90.[11] On October 7, 2016, Ms. Cora e-mailed Vergara again with similar concerns and updated information regarding CMRV's grades and performance, tutoring opportunities, as well as the most recent efforts undertaken by the school and faculty to help CMRV meet his academic conditions. Id. ¶ 91.[12]

CMRV continued to attend the Conservatory's after-school music program during the first semester of eleventh grade.[13] Id. ¶ 94. His music class schedule conflicted with the tutoring sessions provided by Wesleyan's teachers every day after school, from 3:30 PM to 4:30 PM, specifically. Id. ¶¶ 95-96. So, beginning in October one of CMRV's eleventh grade classmates, "KM," tutored him three times a week at 7:00 PM. Id. ¶¶ 98, 101, 103. She also helped CMRV during class. Id. ¶ 97.[14] Despite Ms. Cora's recommendations, Plaintiffs did

---

[11] Plaintiffs response to Defendants' SUMF ¶¶ 90 and 91 is to "admit" the supporting evidence's authenticity only. ECF No. 50-1 at 2. Given that Plaintiffs fail to admit, deny or qualify the substance of Defendants' properly supported facts, the court finds them undisputed.

[12] Vergara's deposition testimony shows that she never received the e-mails in question because the account was "hacked." Regardless, Ms. Cora made a follow-up call to Vergara and read the contents of the e-mails. According to Vergara, she was already aware of the information. See SUMF ¶¶ 92-93; Ex. 5 at 379-380 (ECF No. 32-6 at 104-105). On the other hand, Plaintiffs failed to adequately respond to Defendants' SUMF ¶¶ 93, 94, 95, 96, 98, 101, 102 and 103. ECF No. 50-1 at 2. Having reviewed the evidence with which they are supported, the court finds that these facts are undisputed.

[13] His schedule was: Mondays, 3:30 PM to 4:30 PM; Wednesdays, 3:30 PM to 4:30 PM; Thursdays, 3:30 PM to 4:30 PM; and Saturdays, 12:00 PM to 3:00 PM.

[14] See also Defs.' Ex. 5 at 123-124, 136-137 (ECF No. 32-6 at 52-55). Plaintiffs' deny SUMF ¶ 97 because "KM

not seek or implement other alternatives for CMRV to improve. Id. ¶¶ 102-103. And KM's tutoring lessons were not enough to help CMRV in math. Id. ¶ 99.

### Third "No-Return" Decision

By the end of the first quarter, CMRV was failing to maintain a 75% or more in each class. In Algebra II, for example, his grade was 58%. He also failed to turn in assignments and projects by their due date or attend tutoring lessons on a consistent basis. Id. ¶ 100. On November 14, 2016, Wesleyan decided to expel CMRV for the second semester of eleventh grade given Plaintiffs' failure to satisfy the academic conditions established for his first semester acceptance. Id. ¶ 104; PSMF ¶ 32. Two days later, Vergara met with Ms. Enriquez to discuss CMRV's performance in Algebra II. Id. ¶ 105. Ms. Enriquez informed that CMRV failed to turn in coursework and even missed a quiz. Id. Vergara later asked for reconsideration of Wesleyan's November 14, 2016 no-return decision, but the school denied her request. Id. ¶¶ 106-107. The court states the facts related to the legal action taken by Plaintiffs in response to that decision below. As for CMRV's academic performance, the record shows that he finished the semester with the following final grades: Bible, 82%; English, 77%; Spanish, 78%; Algebra II, 52%; Biology II, 74%; Government, 87%; Economics, --; Music, 98%; Physical Education, 98%. Id. ¶ 109; Ex. 40, ECF No. 35-10.

On January 4, 2017, Plaintiffs filed this suit against Defendants. They also moved the court for a TRO and preliminary injunction. The court issued the TRO and ordered the school to readmit CMRV for the second semester of eleventh grade, beginning in January of 2017. SUMF ¶¶ 108, 110. The parties agreed to convert the TRO into a preliminary injunction

---

actually tutored CMRV in Algebra II." ECF No. 50-1 at 7. Their response does not controvert the proposed fact: that KM helped CMRV during class. The portions of Vergara's deposition testimony cited by Plaintiffs do not create a genuine dispute as to this fact, either. See Defs.' Ex. 5 at 380, ECF No. 32-6 at 105.

or *pendente lite* and adopt a reasonable accommodation plan. Id. ¶¶ 111; ECF No. 15.

Reasonable Accommodations

As part of the reasonable accommodation plan, Wesleyan agreed to provide a desk for CMRV in the first, second or third row of the classroom; administer exams one page at a time; give CMRV additional time to complete exams and hand in class work, as well as clear and individual instructions for assignments and coursework, or repeat instructions upon request; and provide review materials for final exams. SUMF ¶ 112.[15] Wesleyan also agreed to change CMRV to Mr. Gonzalez's Algebra class. Id. ¶ 115.

Vergara, in turn, agreed to attend bi-monthly meetings with teachers and any other additional meetings requested by teachers or staff; procure tutoring lessons for CMRV in the subjects he so required by a certified educator, subject to Wesleyan's approval, and submit monthly attendance records to the high school principal's office; provide Wesleyan with the neurological evaluation performed by Dr. Carlos Barreto Miranda in March of 2015; notify Wesleyan the date of CMRV's scheduled neurological evaluation; procure psychological counseling for CMRV and inform his attendance thereto to the school. Id. ¶ 113. As for CMRV, the parties agreed he would maintain all his grades at 70% or more and good conduct, as well as to comply with Wesleyan's School Wide Discipline Plan, incorporated in the Handbook. Id. ¶ 114.

Other Facts

On February 24, 2017, Vergara met with Ms. Cora and Mr. Rafael Torres, CMRV's Biology teacher, to discuss and coordinate math tutoring lessons for CMRV. Mr. Torres agreed to tutor CMRV and noted that they needed to meet three to four times a week. Id. ¶

[15] Plaintiffs take issue with the fact that Defendants left out other stipulations and conditions contained in the plan. After a careful review, the court finds the omitted portions immaterial to the pending dispositive motion.

116. The lessons began in March of 2017. Id. ¶ 117. During the second semester of eleventh grade, CMRV continued to take music lessons at the Conservatory. Id. ¶ 119. At the end of that semester, CMRV obtained the following grades: Bible, 95%; English, 72%; Spanish, 78%; Algebra II, 68%; Biology II, 96%; Government, --; Economics, 82%; Music, 100%; Physical Education, 91%. Id. ¶ 118.[16] His final grades for that school year were: Bible, 89%; English, 75%; Spanish, 78%; Algebra II, 60%; Biology II, 83%; Government, 87%; Economics, 82%; Music, 99%; Physical Education, 94%. See Ex. 42, ECF No. 36-2.

CMRV's teachers complied with and provided the required accommodations during CMRV's tenth and eleventh grades. SUMF ¶ 135. But Wesleyan readily admits that some of the accommodations requested were denied, to wit, changing CMRV to Mr. Gonzalez's Algebra II class, recording his classes, and photographing the blackboard. Id. ¶ 123. Plaintiffs counter that they also requested bathroom breaks as necessary to accommodate CMRV's renal and urinary condition. ECF No. 50-1 at 9-10. One of his teachers, Laura Burgos, refused to give CMRV bathroom breaks. Id.[17]

Vergara also asked Wesleyan to allow CMRV to record his classes. Wesleyan denied that request not only because, as a matter of fact, Wesleyan students cannot record their classes, but also due to privacy concerns. SUMF ¶¶ 124, 126.[18] To provide that

---

[16] Having considered Plaintiffs' qualifying response, the court modified Defendants' proposed fact to include CMRV's grades for each subject.

[17] It is unclear for what specific condition the bathroom breaks accommodation was needed. The references to renal, kidney and urinary condition(s) without a hint of distinction among them abound in the summary judgment record. Plaintiffs do not provide adequate citations to the record for most of the assertions included in their response to SUMF ¶ 123. Their proposed additional facts on this supposed request for an accommodation falter for the same reasons. Therefore, the court only considered the properly supported facts and disregarded the rest. See Fed. R. Civ. P. 56(c); L. Civ. R. 56(c), (e).

[18] Plaintiffs deny SUMF ¶ 124 by stating that "Wesleyan does allow the recording of classes for students with learning disabilities depending on the student's individual needs[.]" ECF No. 50-1 at 10. Their denial does not controvert Defendants' proposed fact: that for privacy reasons, Defendants denied Plaintiffs' accommodation request. Plaintiffs support their denial with portions of Leyda Mercado's deposition testimony. But a close examination of that evidence heavily suggests that Plaintiffs misquoted Mercado in their attempt to create a factual dispute, as she did not testify that Wesleyan allows students (disabled or not) to record their classes.

accommodation, Wesleyan would have had to obtain authorization from the parents of CMRV's classmates, and as part of that process, disclose the requesting student's (here, CMRV's) learning disability or condition. Id. ¶ 125.

Vergara made another request for reasonable accommodation. She asked Wesleyan to allow CMRV to take photos of the blackboard--where teachers provided materials and instructions for class assignments--with a cellphone or device, instead of taking notes. Id.[19] Wesleyan denied this request. Id. ¶ 123, 133. Vergara later acknowledged that Dr. Perez recommended the use of visual aids for CMRV, not photographing the blackboard. Id. ¶ 134.[20] Per the school's cellphone policy, students are not allowed to use cellphones during school hours and infractions to that policy are subject to varying levels of disciplinary action, up to and including detention and suspension. Id. ¶¶ 130-131. See also Wesleyan Academy School Community Handbook, ECF No. 13-3 at 30-31. One exception to the policy is the use of cellphones during field trips to take notes or photos for class reports, or to contact parents. ECF No. 50-1 at 11.

Furthermore, Wesleyan required all teachers to post all course-related information, class summaries, materials and grades to Edline, the online system used by the school, which students and parents could access from home. SUMF ¶ 132. Vergara testified that the information available in Edline was not always up-to-date. ECF No. 50-1 at 11.

## Cyberbullying

Wesleyan's Anti-Bullying Protocol contains the school's policy against bullying and

---

See Defs.' Ex. 44 at 104-106, ECF No. 36-4; Pls.' Ex. D at 104-106, ECF No. 50-9.
    Because Plaintiffs failed to adequately support their responses to SUMF ¶¶ 125 and 126, these facts are undisputed too.
[19] Plaintiffs did not respond at all to SUMF ¶ 129, so that fact is deemed admitted.
[20] Although Plaintiffs contend that "[a] photograph, most certainly, constitutes a 'visual aid [,]'" their assertion is unsupported. See ECF. 50-1 at 12.

cyberbullying and sets forth preventive measures and the institutional response to bullying incidents. SUMF ¶ 137. It requires teachers and staff to report and investigate all incidents, even when the victim does not formally complain or express disapproval of the purported bullying. PSMF ¶ 48.

On February 26, 2016, Vergara complained to Ms. Llorens and Ms. Cora about a cyberbullying incident CMRV had confronted via group text messages with other Wesleyan students (e.g., student identified as "D.P."). Id. ¶ 45. Vergara did not report or complain about cyberbullying again until December of that year. Id. ¶ 32, 44.[21] See Pls.' Ex. B1 at 395, ECF No. 50-5 at 139. Although Defendants assert that CMRV had no subsequent issues with the perpetrator, Plaintiffs counter that CMRV had to be treated for depression and given medication because of the cyberbullying events. ECF No. 50-1 at 13.

Now, Defendants aver that they learned of the cyberbullying incident by way of the complaint filed in January of 2017. Early in February of 2017, Vergara met with Wesleyan's Dean of Students, Jose L. Mass. She asked him not to activate the anti-bullying protocol, asserting that CMRV had moved on from the one-time incident. See Defs.' Reply Statement of Material Facts ¶ 49, ECF No. 58-2. Because Vergara refused to sign the minutes of the meeting, the school proceeded with the investigation, but subsequent communications with Plaintiffs' counsel brought the school's efforts to a halt. Id.

---

[21] The record suggests that Vergara mentioned the cyberbullying incidents in the letter she wrote to Rev. Benjamin Galarce requesting reconsideration of the no-return decision notified in November of 2016. SUMF ¶¶ 104, 106; PSMF ¶ 32. It is undisputed that Vergara later met with Rev. Galarce—on December 5, 2016 to be exact—to discuss CMRV's expulsion and other related matters. PSMF ¶ 44. Plaintiffs' proposed additional facts on the cyberbullying incidents are either unsupported by the evidence or hotly disputed, as is the case of the proposed facts regarding Vergara's conversation with Mercado about the alleged cyberbullying. See, e.g., PSMF ¶¶ 47-48 and Defs.' Reply Statement of Material Facts, ECF No. 58-2 ¶¶ 47-48.

# IV.    DISCUSSION

A. Rehabilitation Act[22]

## i.   *Disability Discrimination*

Section 504 of the Rehabilitation Act provides "that no otherwise qualified individual with a disability shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal funds." Ruskai v. Pistole, 775 F.3d 61, 77 (1st Cir. 2014) (quoting 29 U.S.C. § 794(a)). Importantly, Section 504 prohibits federally-funded entities and academic institutions from discriminating against disabled students. See Fry v. Napoleon Cmty. Sch., 137 S. Ct. 743, 749 (2017); J.D. ex rel. J.D. v. Pawlet Sch. Dist., 224 F.3d 60, 70 (2d Cir. 2000); Wynne v. Tufts Univ. Sch. of Med., 976 F.2d 791, 795 (1st Cir. 1992).

To establish a prima facie case of discrimination, a plaintiff must show **(1)** that he is a qualified individual with a disability; **(2)** is "otherwise qualified" to participate in or receive services from a program or entity; **(3)** that he was excluded from participating in, denied, or otherwise discriminated against "solely by reason of [his] … disability;" **(4)** that the program or entity received federal financial assistance. Lesley v. Hee Man Chie, 250 F.3d 47, 52-53 (1st Cir. 2001) (alteration in original) (some quotation marks omitted) (citing § 794(a)); Rivera-Concepcion v. Puerto Rico, 786 F. Supp. 2d 489, 500 (D.P.R. 2011). [23]

---

[22] Since Congress modeled many provisions of the American with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., after Section 504, claims under both statutes "are analyzed under the same standards and the case law construing the ADA pertains equally to claims under the Rehabilitation Act." Davila v. Potter, 550 F. Supp. 2d 234, 243 (D.P.R. 2007) (citing Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 12 (1st Cir. 2004); Phelps v. Optima Health, Inc., 251 F.3d 21, 23 n. 2 (1st Cir. 2001)); see also Chenari v. George Washington Univ., 847 F.3d 740, 746–47 (D.C. Cir. 2017) (quoting Am. Council of the Blind v. Paulson, 525 F.3d 1256, 1260 & n. 2, 1266-67 & n. 14 (D.C. Cir. 2008)) (noting that for purposes of analyzing a failure-to-accommodate claim under the Rehabilitation Act, Section 504 is construed *in pari materia* with Title II of the ADA).

[23] Where, as here, a plaintiff offers circumstantial evidence to prove a disability discrimination claim under Section 504, the court applies the burden-shifting framework laid out by the Supreme Court in McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973) and its progeny. See Delgado Echevarria v.

Disability means "(A) a physical or mental impairment that substantially limits one or more of [an] individual's major life activities; (B) a record of such an impairment; or (C) being regarded as having such an impairment...." 29 U.S.C. § 705(20)(B) (incorporating definition found in 42 U.S.C. § 12102). Major life activities are activities "of central importance to daily life," or functions such as "performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." Vazquez v. Municipality of Juncos, 756 F. Supp. 2d 154, 161 (D.P.R. 2010) (quoting 29 C.F.R. § 1630.2) (citing Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 197 (2002)). Thinking and concentrating are also considered major life activities. See Calero-Cerezo, 355 F.3d at 21 (citing Whitney v. Greenberg, Rosenblatt, Kull & Bistoli, P.C., 258 F.3d 30, 33 n. 4 (1st Cir. 2001)).

In the educational setting, an otherwise qualified individual is one who can meet all of an academic program's requirements in spite of his or her disability, with or without reasonable accommodation. See Bercovitch v. Baldwin Sch., Inc., 133 F.3d 141, 154 (1st Cir. 1998) (citing Southeastern Community College v. Davis, 442 U.S. 397, 405 (1979)); S.S. by S.Y. v. City of Springfield, Massachusetts, 146 F. Supp. 3d 414, 419-20 (D. Mass. 2015) ("[i]f there are reasonable modifications that would allow a school to accommodate a disabled individual, the individual is qualified for the program offered by the school.").

In this case, Defendants concede CMRV is physically and mentally disabled for

---

AstraZeneca Pharm. LP, 856 F.3d 119, 133–34 (1st Cir. 2017); Rios-Jimenez v. Principi, 520 F.3d 31, 40-41 (1st Cir. 2008) (applying McDonnell Douglas framework to disability discrimination claim under the Rehabilitation Act).

   If the plaintiff succeeds at the prima facie stage, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the alleged adverse action against plaintiff. See Novak v. Bd. of Trustees of S. Illinois Univ., 777 F.3d 966, 974 (7th Cir. 2015) (citing Bunn v. Khoury Enters., Inc., 753 F.3d 676, 685 (7th Cir. 2014)). If the defendant articulates such a reason, then the plaintiff must present evidence that the proffered reason is pretext for discrimination. Id. (quoting Steinhauer v. DeGolier, 359 F.3d 481, 484 (7th Cir. 2004)); Rios-Jimenez, 520 F.3d at 40-41 (citing McDonnell Douglas, 411 U.S. at 802, 804).

summary judgment purposes.[24] Thus, the first prima facie element is met. Insofar as Defendants admit that Wesleyan receives federal funds, the school is a covered entity under the Rehabilitation Act. This satisfies the fourth element of the test. Further, it is undisputed that CMRV was subjected to adverse actions because he was expelled on more than one occasion from the school. On this basis, the third element of the test is met.[25]

Now, Defendants argue that CMRV is not "otherwise qualified" because he could not meet Wesleyan's academic standards and requirements for continued enrollment even with reasonable accommodations. Plaintiffs disagree maintaining that CMRV did meet Wesleyan's essential eligibility requirements, like age and entering academic credentials. See Pls.' Mem. of Law in Supp. of Opp'n to Defs.' "MSJ," ECF No. 50 at 12.

At the outset, the court must note that Plaintiffs confuse essential eligibility requirements for admission with those for continued enrollment. On the one hand, the Wesleyan Academic Policy Manual mentions four basis qualifications for admission (SUMF ¶ 3). On the other, the Manual establishes essential eligibility standards and requirements for graduation and course credit, participation in non-credit activities and other areas of student life, and guidelines for determining conditions for admissions, denial of readmission, academic probation or suspension. See Wesleyan Policy Manual, ECF No. 13-1 at 57-95.

The Policy Manual's section on student affairs warns that the Admissions Committee may place students who show questionable behavior, poor attitude, or poor academic performance on disciplinary or academic conditions, set the duration of the conditions, and

[24] Notwithstanding, Defendants mention that their expert evidence discredits CMRV's ADD diagnosis. Defendants thus suggest that CMRV was never entitled to reasonable accommodations. See Defs.' Reply Statement of Material Facts at 6, n. 1, ECF No. 58-2.
[25] Plaintiffs' claim under Section 504 for failure to accommodate is discussed infra at subsection ii.

stipulate special expectations.[26] These conditions become part of the contract between Wesleyan and the student, and Wesleyan can deny readmission or return for the second semester or the subsequent school year based on the student's noncompliance with the conditions. See id. at 57-59.

As the material facts and evidence show, CMRV's documented struggles with Wesleyan's academic standards date back to his elementary school years.[27] For present purposes, however, the court will only mention those that brought about the "no-return" or expulsion decisions. In January of 2015, the Admissions Committee made the first no-return decision challenged by Plaintiffs; it was based on CMRV's poor academic performance— including two F's—, his noncompliance with Wesleyan's attendance policy, and other factors. He was in ninth grade at the time. On May 20, 2015, the Admissions Committee decided to readmit CMRV with conditions for the tenth grade, like keeping a minimum grade of 70% in all his classes, electives included. The letter warned that the Committee would evaluate CMRV's progress on a quarterly basis to determine his eligibility to remain at Wesleyan, and that the conditions for acceptance would be re-evaluated in October of 2016 (at the end of the first quarter). See Defs.' Ex. 26, ECF No. 34-6.

Having been diagnosed with ADD back in February of 2015, Plaintiffs met at the start of the first semester of tenth grade to establish reasonable accommodations, like a reserved desk for CMRV in the front of the classroom and additional time for exams and homework. Despite the reasonable accommodations provided, which, by CMRV's own admission, allowed him to focus, he failed to comply with eligibility requirements established for his

---

[26] In other cases, one or more F's or two or more D's could land a student on academic probation.

[27] His final grades for eighth grade were, in relevant part, a 65% in Math, a 58% in Social Studies, and a 55% in Bible.

tenth grade.[28] The Admissions Committee issued the second no-return decision on January 24, 2016.

After Vergara asked for reconsideration, the Committee decided to offer readmission for the first semester of eleventh grade subject to conditions, including a minimum grade of 75% in each of CMRV's classes, per quarter. Despite Plaintiffs' contentions,[29] Vergara re-enrolled CMRV in school, thus accepting to abide by these eligibility requirements and conditions. The uncontroverted facts demonstrated that for the first quarter of CMRV's eleventh grade, during the 2016-2017 academic year, CMRV had a 58% in Algebra II. Also, he was not submitting all assignments in a timely manner or complying with tutoring conditions. Wesleyan thus decided not to admit him for the second semester of the 2016-2017 school year.

Based on these and the other undisputed material facts recounted above, the court concludes that Plaintiffs are unable to show that CMRV was "otherwise qualified" for continued enrollment at Wesleyan. Even if Plaintiffs could surpass that hurdle, that is, show that CMRV met essential eligibility requirements with reasonable accommodations, neither the facts nor the evidence on this record suggest that any of the challenged decisions were made solely because of CMRV's actual or perceived disabilities (be it his ADD, renal or urinary conditions, or depression), as opposed to his repeated noncompliance with the school's performance requirements and  academic conditions. Rivera-Concepcion, 786 F. Supp. 2d at 500 (dismissing Rehabilitation Act claim given plaintiff's failure to show she was

---

[28] By the end of the first semester, CMRV had obtained two D's.

[29] Specifically, the court is referring to Plaintiffs' argument that Defendants deviated from Wesleyan's policy by raising the passing grade to 75%, which also constituted discrimination. Upon a straightforward reading of the relevant evidence—the Policy Manual, Handbook, and the Admissions Committee's letters—the court concludes that Wesleyan could rightfully place the 75% threshold as a condition for readmission, whether for a semester or an entire school year, in accordance with its academic policy. See ECF No. 13-1 at 52-74.

"otherwise qualified" for the internship position from which she was expelled, and that the expulsion was solely grounded on her mental disability, as opposed to her absenteeism and behavior). Therefore, Plaintiffs still fail to establish a prima facie case of disability discrimination.

### ii. *Failure to Accommodate*

Plaintiffs allege that Defendants violated Section 504 by failing to provide several reasonable accommodations for CMRV. They argue that CMRV's academic performance would have been satisfactory had Wesleyan provided him with the requested reasonable accommodations, which were recommended by the minor's health professionals, but Defendants never implemented. Wesleyan allegedly ignored Vergara's repeated requests for reasonable accommodations on behalf of her son.

Section 504 requires covered entities to offer eligible students meaningful access to reasonable accommodations. Alexander v. Choate, 469 U.S. 287, 301 (1985); Theriault v. Flynn, 162 F.3d 46, 48 (1st Cir. 1998). Defendants well recognize that "[a] federally-funded organization violates Section 504 if it denies a qualified individual with a disability a reasonable accommodation that the individual needs in order to enjoy meaningful access to the benefits of public services." ECF No. 32 at 12 (citing Rivera-Concepcion, 786 F. Supp. 2d at 500).

The elements of a prima facie case for failure to accommodate are like those required under a disability discrimination theory, but for purposes of the third prong, Plaintiffs must prove that Defendants knew of CMRV's disability yet did not reasonably accommodate it. See Enica v. Principi, 544 F.3d 328, 338 (1st Cir. 2008) (citing Calero-Cerezo, 355 F.3d at 20) (discussing the elements of a prima facie case for a failure-to-accommodate claim under the Rehabilitation Act in the employment context).

Generally, to trigger a defendant's obligation to provide any type of accommodation, the plaintiff's "request must be sufficiently direct and specific, and it must explain how the accommodation is linked to plaintiff's disability." Jones v. Nationwide Life Ins. Co., 696 F.3d 78, 89 (1st Cir. 2012) (citing Freadman v. Metro. Prop. & Cas. Ins. Co., 484 F.3d 91, 102 (1st Cir. 2007). But see Bajandas v. Cupeyville, Inc., 61 F. Supp. 3d 218, 220 (D.P.R. 2014) (citing Ballard v. Rubin, 284 F.3d 957, 962 (8th Cir. 2002)) (noting, in an employment discrimination case under the ADA, that "[t]he employee's request does not have to be in writing or formally invoke the magic words 'reasonable accommodation.'").

Here, it is undisputed that CMRV underwent various psychological evaluations but was not diagnosed with ADD or other learning disability until February 14, 2015. Plaintiffs argue that Defendants had a duty to accommodate him since 2009 because, unbeknownst to Vergara, CMRV appeared on a purported list of students that needed accommodations. Their contention is unavailing. First, there are no set of facts present that could allow a reasonable jury to conclude that Plaintiffs put the school on notice of CMRV's disabilities and that they requested specific accommodations for those disabilities prior to 2015. As Defendants well point out, Wesleyan had no obligation to provide unrequested accommodations for unknown disabilities before then. See Halpern v. Wake Forest Univ. Health Scis., 669 F.3d 454 (4th Cir. 2012) (medical school had no obligation to accommodate medical student's disability [ADHD] until he provided proper diagnosis to and requested specific accommodations, which he only did after engaging in misconduct that warranted dismissal from the program); Carten v. Kent State Univ., 78 F. App'x 499, 501 (6th Cir. 2003) (citing Kaltenberger v. Ohio College of Podiatric Med., 162 F.3d 432, 437 (6th Cir. 1998) (school not required to accommodate plaintiff's disability until he "provided a proper diagnosis...and requested specific accommodation.")); Wynne v. Tufts Univ. Sch. of Med.,

976 F.2d 791, 795–96 (1st Cir. 1992) (alteration in original) (quoting <u>Nathanson v. Medical College of Pa.</u>, 926 F.2d 1368, 1381 & 1386 (3d Cir. 1991)) (recognizing that "an academic institution can be expected to respond only to what it knows or is chargeable with knowing," and thus, a relevant part of the Section 504 inquiry is "whether the student ever put the school on notice of his handicap by making 'a sufficiently direct and specific request for special accommodations.').

Second, Plaintiffs' argument is underdeveloped. In their opposition, Plaintiffs neither raise genuine issues of material fact to defeat Defendants' motion on this point, nor do they cite any analogous cases or on-point legal authority to sustain their theory. This pales in comparison to the relevant case law and reasoned analysis offered by Defendants. The problem for Plaintiffs is that "[j]udges are not mindreaders. Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace." <u>Echevarría v. AstraZeneca Pharmaceutical LP</u>, 856 F.3d 119, 139 (1st Cir. 2017) (quoting <u>United States v. Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990)). This includes "highlighting the relevant facts and analyzing on-point authority." <u>Rodriguez v. Mun. of San Juan</u>, 659 F.3d 168, 175 (1st Cir. 2011) (citation omitted). The upshot is that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." <u>Zannino</u>, 895 F.2d at 17.

To recap, the court concludes that even if CMRV was "regarded as" disabled before 2015, thus triggering a duty to accommodate, Plaintiffs have failed to meet their burden of showing in the first instance what specific accommodation CMRV needed and how those

accommodations were connected to his undiagnosed disabilities.[30] See Ortiz-Martinez v. Fresenius Health Partners, PR, LLC, 853 F.3d 599, 605 (1st Cir. 2017).

*Requests for Accommodations after ADD Diagnosis*

With respect to reasonable accommodations requests *after* CMRV's ADD diagnosis in February of 2015, the record amply demonstrates that Wesleyan provided most, if not all the accommodations or modifications recommended by CMRV's treating professionals. The court notes, again, that CMRV was diagnosed with ADD approximately one month after the Admissions Committee decided to deny him admission to tenth grade based on his poor academic performance, conduct issues, and noncompliance with the school's standards and policies.[31] After the school reconsidered that decision and readmitted CMRV subject to conditions, school officials met with Vergara several times to discuss appropriate accommodations for CMRV.

On September 25, 2015, the parties established a reasonable accommodation plan. CMRV had a reserved desk in the front rows of the classrooms to improve his focus; his teachers gave him more time to complete exams and extensions of time to submit assignments and projects. The mutually agreed upon accommodations undisputedly ameliorated CMRV's learning disabilities, which mostly affected him in math subjects. The record further demonstrates instances where CMRV belatedly requested more time to turn in assignments to receive partial credit. Despite the accommodations, CMRV failed two classes during the first semester of tenth grade and did not comply with other conditions established for readmission.

---

[30] Indeed, Plaintiffs make no effort to mention what accommodations CMRV needed for which of the alleged disabilities.

[31] Even before the diagnosis, Defendants requested professional evaluations and recommendations from Plaintiffs to help CMRV improve not only his grades, but also, his relationships and social interactions.

In September of 2016, CMRV's academic woes continued, which prompted another meeting between Plaintiffs, the high school principal, and two of CMRV's math teachers. Vergara asked that her son be placed in Mr. Gonzalez's algebra class because she understood that his teaching style was better than Ms. Enriquez's. Defendants denied the accommodation but provided alternatives, one of which was that CMRV could seek Mr. Gonzalez's help during lunch and office hours. The fact is that he never did. Ms. Enriquez tutored CMRV three to four times weekly for some time, and he was later tutored by another student, who also assisted CMRV in class. Despite the alternatives provided in lieu of the requested accommodation, and Defendants' additional efforts and many warnings (see, e.g., SUMF ¶¶ 90-91, 95-96, 98, 101, 103), CMRV continued to miss deadlines and his grades did not improve. Defendants further point to the uncontroverted fact that CMRV was placed in Mr. Gonzalez's class after the filing of this lawsuit. Yet, CMRV finished the semester with a 68% in Algebra II notwithstanding the accommodation and the supposed benefits of Mr. Gonzalez's teaching style.

Plaintiffs challenge Wesleyan's denial of their request for recording classes as an accommodation for CMRV. Defendants counter that the request was unreasonable and their denial, based on legitimate, non-discriminatory policy and privacy reasons. As matter of policy, students cannot record their classes. Leyda Mercado explained during her deposition that part of the policy's rationale is to avoid the misuse of class recordings for non-academic purposes. Also, the school would have had to engage in the gargantuan task of first obtaining the written consent of all the parents of every other minor student in all of CMRV's classes before allowing him to record his classes. The court agrees that this request was, therefore, far from reasonable.

Next, there is the request to allow CMRV to take photos of the blackboard, instead of taking notes, which Wesleyan denied. According to Vergara, this would have entailed a minor adjustment on the school's part that was necessary to accommodate CMRV's ADD and lagging visual motor skills. The court reiterates what Vergara's own testimony shows— that Dr. Perez, CMRV's treating psychologist, recommend the "use of visual aids," not taking photographs of the blackboard. A careful review of Dr. Perez's 2015 evaluation report demonstrates that she recommended the use of the following "visual aids:" highlighter tape erasable highlighter, hefty tabs, post-it notes, tabs, etc. ECF No. 42-3 at 22. Photographs from a mobile device were not included in the list.

Defendants assert that the requested accommodation was unreasonable in light of Wesleyan's cellphone policy, which bans the use of mobile devices by students during school hours. Although Plaintiffs point out that the use of cellphones is allowed for field trips, the court finds that exception to Wesleyan's policy irrelevant to the present analysis. Moreover, it is undisputed that Wesleyan provided alternatives to Plaintiffs' accommodation request: CMRV could take handwritten notes of the blackboard and access class materials and his assignments from home. As previously determined, Wesleyan requires teachers to post materials covered in class and assignments to Edline, thus permitting students to access them remotely.

The court will not second-guess Wesleyan's decisions on these matters. The court certainly agrees that it is unreasonable to expect the school make an exception to its written policy, especially when the exception at issue could potentially evolve into a slippery slope of allowing students to use electronic devices in class and during school hours. And particularly when alternatives were not only already available, but also, suggested during the many meetings between Plaintiffs and school faculty and staff. As Defendants well point out,

the record in this case shows that reasonable alternatives were in fact provided, but CMRV simply chose not to take advantage of them.

Finally, Plaintiffs take issue with the fact that one of CMRV's teachers refused to give him bathroom breaks. The record is completely silent as to the time and circumstances surrounding that refusal. There is also no evidence showing that Plaintiffs, at the very least, made a specific request for this accommodation and explained the link between CMRV's disability and the bathroom break accommodation. Based on the discussion of the applicable law, the undisputed fact of that teacher's refusal fails to carry Plaintiffs' failure-to-accommodate claim forward.

Based on the foregoing discussion, the court **GRANTS** Defendants' motion for summary judgment as to Plaintiffs' discrimination claims for failure to accommodate.

### iii.   _Duty to Engage in an Interactive Process_

Sometimes, "it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3). A request for an accommodation may thus trigger an entity's duty to "engage in a meaningful dialogue with the disabled individual to find the best means for accommodating that disability." Enica, 544 F.3d at 338-39 (citing Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100, 108 (1st Cir. 2005)). Both parties "are bound to cooperate and communicate in good faith in the interactive process." Mercado Cordova v. Walmart Puerto Rico, Inc., 369 F. Supp. 3d 336, 356 (D.P.R. 2019) (citing Phelps v. Optima Health, Inc., 251 F.3d 21, 27-28 (1st Cir. 2001)) (so noting, albeit in regard to employee's failure-to-accommodate claim under the ADA).

A claim for failure to engage in the aforementioned interactive process depends on finding that (1) a breakdown in the process occurred due to the defendant's failure to participate in good faith or the disabled individual's refusal to explore reasonable accommodations; and (2) the parties could have indeed found a reasonable accommodation that would enable the disabled individual perform the essential job's functions, or here, to meet the academic program's requirements, if the interactive process had not broken down. Charette v. St. John Valley Soil & Water Conservation Dist., 332 F. Supp. 3d 316, 361 (D. Me. 2018) (citing Jones, 696 F.3d at 91; Enica, 544 F.3d at 339).

Again, in this case, it is undisputed that CMRV was diagnosed with ADD in February of 2015 and that the parties established various accommodations for CMRV afterwards. But even before CMRV's diagnosis, Wesleyan continually attempted to help CMRV improve his grades and conduct by asking Vergara to become involved in her son's education and communicate frequently with faculty and teachers, seek occupational therapy for CMRV, and procure tutoring lessons for him. CMRV also communicated with teachers to discuss his grades and tools for academic improvement, and the record so shows. See SUMF ¶¶ 34-40, 43.

As discussed in the previous section, at the beginning of CMRV's tenth grade the parties met and established a reasonable accommodation plan. His teachers complied with the plan by giving CMRV more time to complete exams and quizzes. CMRV met with his guidance counselor several times and kept communicating with his teachers, often seeking leniency in the enforcement of deadlines for projects and assignments. One of the conditions in place for the 2015-2016 academic year required Vergara to meet with teachers, at least, monthly. Id. ¶¶ 47-50.

Wesleyan required quarterly meetings between CMRV's parents and teachers during CMRV's first semester of eleventh grade. Id. ¶ 61-62. Although no reasonable accommodation plan was established for that first semester, the uncontroverted facts sufficiently demonstrate that the parties still engaged in meaningful dialogue to determine accommodations CMRV. The meetings and written communications between Plaintiffs, Defendants and CMRV's teachers in August and September of 2016, as well as the accommodation alternatives they discussed and agreed on during that time frame and beyond, are just an example of Defendants' compliance with Section 504's mandate. Id. ¶¶ 74-77, 78, 87, 90-91.

On this record, the court finds no evidence of a breakdown in the required interactive process as the result of Defendants' lack of good faith or efforts, let alone that the school refused to partake in that process, period. On the contrary, the facts here demonstrate that Defendants tried to work constructively with Plaintiffs to address their concerns and meet CMRV's needs. Finally, there is no evidence for a reasonable factfinder to conclude that other reasonable accommodations satisfactory to Plaintiffs would have been determined but for Defendants' failure to partake in meaningful dialogues with Vergara and CMRV.

Consequently, Defendants' request for dismissal of Plaintiffs' Section 504 claims for failing to engage or participate in the required interactive process is **GRANTED**, and the claims, dismissed.

### iv.   *Retaliation*

Plaintiffs claim retaliation under Section 504 of the Rehabilitation Act, which "prohibit[s] retaliation against any person, whether disabled or not, for opposing disability-based discrimination made unlawful by that statute." D.B. ex rel. Elizabeth B. v. Esposito, 675 F.3d 26, 40 and n. 9 (1st Cir. 2012) (alteration in original) (citing 28 C.F.R. §

42.503(b)(1)(vii)). A plaintiff's retaliation claim "does not depend on the success of [his] disability claim." Jones v. Walgreens Co., 679 F.3d 9, 20 (1st Cir. 2012) (citing Colón–Fontánez v. Municipality of San Juan, 660 F.3d 17, 36 (1st Cir. 2011)). Retaliation claims under Section 504, like those under the ADA, are analyzed under the McDonnell-Douglas burden-shifting framework. D.B., 675 F.3d at 41 (citing Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ., 595 F.3d 1126, 1131 (10th Cir. 2010)).

To establish a prima facie case of retaliation, a plaintiff must show that: "(1) he engaged in protected conduct, (2) he was subjected to an adverse action by the defendant, and (3) there was a causal connection between the protected conduct and the adverse action." Id. (citing Carreras v. Sajo, Garcia & Partners, 596 F.3d 25, 35 (1st Cir. 2010)). If the plaintiff succeeds, the burden shifts to the defendant to provide legitimate, non-retaliatory reasons for the alleged adverse action. Id. (citing Carreras, 596 F.3d at 36, and Reinhardt, 595 F.3d at 1131). If the defendant does so, the burden shifts back to the plaintiff to establish that the proffered reasons are pretextual, meaning a cover-up for the defendant's retaliatory motivation. Delgado Echevarria, 856 F.3d at 134 (quoting Collazo-Rosado v. Univ. of P.R., 756 F.3d 86, 92 (1st Cir. 2014)).

Here, Plaintiffs argue that they engaged in protected conduct by requesting reasonable accommodations for CMRV, and that after doing so, he was expelled three times.[32] Plaintiffs also allege that they complained of cyberbullying (protected conduct in itself), and that Defendants' failure to act on the reported peer-on-peer harassment could have been a retaliatory measure. Plaintiffs' retaliation arguments hinge on the temporal

---

[32] The court notes that the first of these expulsions (or "no-return" decision, as Wesleyan calls it) was made on January 13, 2015, before the ADD diagnosis and requests for accommodations discussed above. This fact does not affect the retaliation analysis or result.

proximity between their protected conduct and the adverse actions taken by Defendants.

The fact is that Plaintiffs engaged in protected conduct on different occasions.[33] The record shows that beginning in February of 2015, Plaintiffs made several requests for accommodations and modifications to allow CMRV to meet Wesleyan's academic standards and particularized enrollment conditions established for his enrollment. The first reasonable accommodation plan was implemented on September 25, 2015, and four months later, Wesleyan informed the second no-return decision, thus preventing CMRV from advancing into eleventh grade at Wesleyan. "The gap of four months, on its own, is not 'very close' for establishing causality." Pena v. Honeywell Int'l, Inc., 923 F.3d 18, 32 (1st Cir. 2019) (citing Cherkaoui, 877 F.3d at 28–29); Hollander v. American Cynamid Co., 895 F.2d 80, 85 (2d Cir. 1990) (no causal connection established despite the fact that adverse action occurred within four months of plaintiff's protected activity). But there is more evidence suggesting retaliation on the record.

In February of 2016, Vergara reported a cyberbullying incident to Ms. Llorens and Ms. Cora after CMRV's classmates sent hateful text messages about her son to a group chat. The school did not investigate or take any disciplinary action against the alleged perpetrators.[34] In January of 2017, almost a year after Vergara reported the incident, Defendants tried to activate the school's antibullying protocol to investigate. In a futile attempt to avoid liability, Defendants insist that they lacked knowledge of the incident before

---

[33] Here, the parties do not dispute Vergara's advocacy for CMRV is protected conduct under the Rehabilitation Act, so the court does not dwell on this point of law. See D.B., 675 F.3d at 41 (advocating on behalf of disabled student's right under the Rehabilitation Act and the ADA to be free from disability-based discrimination plainly constitutes protected conduct under these statutes).

[34] The complaint alleges that other students engaged in cyberbullying against CMRV and that their unidentified parents are liable for the damages suffered by Plaintiffs as a result. ECF No. 1 at ¶¶ 37-39, 48-49. However, Plaintiffs never amended their complaint to include the minors' parents in this action and Wesleyan continues to deny any liability for the acts of these minors outside of school and during off-hours. See ECF No. 32 at 24-26.

the filing of the complaint. They also try to hide behind legal technicalities, arguing that one hateful text message, by one student, at 6:54 PM does not rise to the level of bullying. Defendants' excuses fall woefully short of legitimate, non-retaliatory reasons for their failure to act and subsequent adverse actions against Plaintiffs.

On August 12, 2016, the parties met to review conditions for CMRV's acceptance to the first semester of eleventh grade. Approximately a month later, during a meeting between Plaintiffs and Llorens, Ms. Enriquez and Mr. Gonzalez, Vergara requested a transfer from Ms. Enriquez's to Mr. Gonzalez's math class as an accommodation for CMRV. This request, which constitutes protected conduct, was instantly denied. Plaintiffs mention that two other non-disabled students were transferred to Mr. Gonzalez's math class, thus allowing an inference of differential treatment. See Gonzalez-Bermudez, 214 F. Supp. 3d at 159 (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 827 (1st Cir. 1991)) (mentioning differential treatment as one of many sources of circumstantial evidence that can demonstrate retaliation).

On November 14, 2016, before the semester ended, Wesleyan expelled CMRV for a third time. This adverse action took place within three months after the first semester meeting, and two months after Plaintiffs' requested CMRV's placement in a different math class.[35] The First Circuit has viewed a two-month time gap between Plaintiffs' protected conduct and the adverse action as "close enough to suggest causation." Sanchez–Rodriguez v. AT & T Mobility P.R., Inc., 673 F.3d 1, 15 (1st Cir. 2012) (finding "very close" temporal proximity for causation purposes where the plaintiff filed an EEOC complaint in February 2007 and was disciplined in May 2007).

[35] The court assumes without deciding that Vergara advocated on behalf of her disabled son during the August 2016 meeting.

Now, Defendants argue that they had legitimate, non-discriminatory reasons for their adverse decisions against CMRV. Mostly, they point to the fact that CMRV failed to meet Wesleyan's academic requirements and other conditions imposed by the Admission Committee for re-enrollment. But Plaintiffs contend that for the first semester of eleventh grade, CMRV would have complied with all requirements and conditions had it not been for Wesleyan's decision to raise the minimum passing grade to 75%. They further point out that the school's deviation from its own policy could be construed as pretext for retaliation. The court is inclined to agree. See Echevarria, 856 F.3d at 136 (citing Acevedo-Parrilla, 696 F.3d at 142-43) (recognizing that a defendant's material deviation from policy or standard procedure can establish a genuine dispute of material fact as to whether the defendant's articulated justifications are pretextual).

Because "[c]ourts confronted by summary judgment motions must focus on the evidence as a whole[,]" the final critical question is whether the aggregate evidence of pretext and retaliatory animus is enough to make out a jury question. [36] Gonzalez-Bermudez, 214 F. Supp. 3d at 159–60 (quoting Mesnick, 950 F.2d at 827) (denying defendants' motion for summary judgment seeking dismissal of the plaintiff's retaliation claims under the ADEA). For the reasons discussed above, the court concludes that Plaintiff has submitted sufficient evidence suggesting differential treatment and deviations from school policy to support a claim of retaliation when considering the record as a whole. Therefore, the court **DENIES** Defendants' motion for summary judgment requesting dismissal of Plaintiff's claims of retaliation under the Rehabilitation Act.

---

[36] In the alternative, the record and the parties' briefs on this issue are too underdeveloped for granting summary judgment on the retaliation claims. The court will not do counsel's work. See Echevarría, 856 F.3d at 139; Zannino, 895 F.2d at 17.

### *v.   Other Section 504 Violations*

A. Section 504

Plaintiffs claim that Defendants violated the Rehabilitation Act because they did not designate a Section 504 coordinator or establish an informal grievance process. They only cite a single decision in support of their argument, <u>Guckenberger v. Bos. Univ.</u>, 974 F. Supp. 106, 142-44 (D. Mass. 1997), a case in which the court determined (after reasoned analysis) that "a student has no cause of action to enforce the Section 504 regulations guaranteeing due process...." This holding certainly disfavors Plaintiffs' case. And upon further reading, the court finds that their request for relief on this technical violation, without more, fails. <u>See</u> <u>Halasz v. Univ. of New England</u>, 816 F. Supp. 37, 45 (D. Me. 1993) (finding that University's technical violation of regulation by failing to name coordinator in notice of nondiscrimination policy entitled plaintiff to no relief without showing of harm from the violation). Consequently, Defendants' motion for summary judgment on this claim is **GRANTED**.

In their opposition, Plaintiffs claim that CMRV was the victim of student-on-student disability-based harassment, and for the first time, raise a claim of discrimination under Section 504 for deliberate indifference to that harassment. Plaintiffs did not raise this claim in their complaint or sought leave to amend to include it. The court finds that Plaintiffs' omissions are fatal, and therefore, will not allow them to amend their allegations through the opposition to Defendants' motion for summary judgment. <u>See</u> <u>Castro-Medina v. Procter & Gamble Commercial Co.</u>, 565 F. Supp. 2d 343, 364 (D.P.R. 2008) (citing cases) (so concluding with respect to plaintiff's attempt to amend her allegations on the major life activities that were supposedly limited by her impairments via her opposition to the defendant's motion for summary judgment).

B. Law 44

Plaintiffs also claim disability discrimination and retaliation under Puerto Rico's Law 44. See ECF No. 1 at 13-14. "Law 44 bans discrimination against the disabled by any public or private institution that receives funds from the Commonwealth of Puerto Rico." Torres v. House of Representatives of the Commonwealth of P.R., 858 F. Supp. 2d 172, 194 (D.P.R. 2012). Specifically, it prohibits covered institutions from taking any discriminatory action against physically or mentally disabled persons. See 1 P.R. LAWS ANN. § 504. "Law 44 'is Puerto Rico's counterpart to the ADA.'" Caez-Fermaint v. State Ins. Fund Corp., 286 F. Supp. 3d 302, 320 (D.P.R. 2017) (quoting Salgado–Candelario v. Ericsson Caribbean, Inc., 614 F.Supp.2d 151, 175 (D.P.R. 2008)).

To establish a prima facie case of discrimination under Law 44, a plaintiff must prove the same elements as those required under the ADA. Id. The court already found that based on the undisputed facts Plaintiffs cannot establish a prima facie case of disability discrimination, be it on a simple disability-based discrimination theory or on failure to accommodate grounds. The court also concludes that Plaintiffs did not present any evidence demonstrating that Wesleyan receives funds from the Commonwealth and, therefore, is a covered institution under Law 44.

Based on the foregoing, the court **GRANTS** Defendants' motion for summary judgment seeking dismissal of the coterminous claims under Law 44. On the other hand, the court **DENIES** their request for dismissal of Plaintiffs' retaliation claims under Law 44. These survive summary judgment for the same reasons discussed in Section IV(A)(iv).

C. Other Puerto Rico Law Claims

As noted above, Plaintiffs assert a claim under Puerto Rico law based on alleged incidents of cyberbullying perpetrated by CMRV's classmates during his eleventh grade.

Defendants move for dismissal of this claim, arguing that the school complied with its obligations under Law 104 of August 1, 2016, as amended ("Law 104"), by implementing an anti-bullying protocol that establishes preventive measures and institutional response to bullying and cyberbullying incidents like the ones Plaintiffs allege. Even if they could avoid liability on their purported compliance with the law, the evidence suggests that Defendants knew or should have known of the alleged cyberbullying since February of 2016, when Vergara complained to school officials. Yet, Defendants failed to activate the school's protocol and investigate the matter promptly. Their argument regarding CMRV's forgive-and-forget attitude is insufficient to sustain their request for dismissal of the remaining claims. At bottom, Plaintiffs have pointed to sufficient evidence to create a triable issue of fact on the matter of Defendants' liability for any damages suffered as the result of the alleged cyberbullying. There is also enough evidence suggesting that after the cyberbullying events, CMRV was diagnosed with depression and received medical treatment as a result.

Next, Defendants argue that the law in question does not provide Plaintiffs with an independent basis for recovery for any damages suffered as the result of the alleged cyberbullying. According to Defendants, the only basis for recovery is Puerto Rico's general torts statute, Article 1802 of the Puerto Rico Civil Code. By their own admission, then, if Plaintiffs cannot recover damages under Law 104, the Plaintiffs could still have recourse under Article 1802. See ECF No. 1 at 14-15. Accordingly, Defendants' motion for summary judgment requesting dismissal of Plaintiffs' claims under Puerto Rico law as the result of cyberbullying is **DENIED.**

# V.    CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment (ECF No. 32) is hereby **GRANTED** as to Plaintiffs' discrimination claims under Section 504 of the Rehabilitation Act and Law 44; **DENIED** as to Defendants' request for dismissal of Plaintiffs' retaliation claims under Section 504 and Law 44, and **DENIED** as to the request for dismissal of the claims based on the alleged cyberbullying, either under the Cyberbullying Act or Article 1802 of the Puerto Rico Civil Code.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, September 4, 2019.

**S/ JUAN M. PÉREZ-GIMÉNEZ**
JUAN M. PÉREZ-GIMÉNEZ
SENIOR U.S. DISTRICT JUDGE
